Here, our third case of the morning, which is Kelly J. Sinico v. Commonwealth of Pennsylvania, case number 22-2998. Counsel for appellate, you may approach. And how many minutes would you like for rebuttal? Good morning, Your Honors. Two minutes, please. Sure. May it please the court. My name is Attorney Andrew Muir. I represent Kelly Sinico plaintiff in this matter. We are focusing on three areas of law where we think this case should be overturned. And that is really using the facts that defendants have put into the record. They have made some attempts to limit the factual record. So even using the facts, the limited fact we have with defendant, we think we can prevail in three major areas. Those areas include the adequate notice, family leave, medical leave act issue. The second, there's a second part of the family medical leave issue that's very critical. And that is the kind of the triggering event issue that's raised in this court's precedent hearing in Lichtenstein. And then the third has to do with whether there's a co-employer status such that plaintiff has met the GLUS exception in this court such that her ADA claim can move forward. Before you go to those, I want to know what standard of review applies to this case. And as you answer the question, I want to focus on a few things. As I understand your papers, you can see that on October 3rd, 2022, the appellants read the report and recommendations and requested that an appeal be filed. But at that point, wouldn't the thing that has made more sense if you wanted the de novo standard of review to apply would have been to file a Rule 60B motion, which would have, of course, told the deadline for your appeal. And given the fact that there wasn't a Rule 60B motion file, why would we apply de novo standard of review rather than plain error? Thank you, Your Honor. I agree with you that that was an option. I didn't know of that option at the time. We received the notice and met with the client and quickly determined that we needed to file an appeal. In retrospect, we could have explored that option, but we didn't. Let me ask you another question. So Local Rule 5.7 of the Middle District of Pennsylvania provides that transmission of a notice of electronic filing constitutes service of the file document upon each party in the case who is registered as a filing user. And then Section 6 from the Middle District Standing Order Numbers 5 through 6 says this is on electronic case and filing policies and procedures says immediately upon the entry of an order or judgment in an action, the clerk will transmit to the filing users in the case in electronic form a notice of electronic filing. Electronic transmission of the notice of electronic filing constitutes the notice required by Federal Rules of Procedure 77D. Doesn't that mean that counsel was constructively served and that the plain error review applies here? If we had received the notice, yes, but we believe the District Court erred because we did not receive that electronic notice. It was not emailed to either of the two email addresses on record. Okay. I don't think that's, I don't know if that's indisputable, but it is a fact that I'm testifying to. I did speak with the clerk about it. They said that my address is recurrent and that somehow the notice, the electronic notice, was turned off. The court indicated or the clerk, whoever I spoke with, indicated they didn't do it. I certainly wouldn't have turned off my own notification. So we did not receive the notice. Is that a matter of record somehow? Has that been made? It was not. Sorry. It's a note. Go ahead. Sorry. No, it was never. It was never brought up until Defense Counsel wrote their reply brief. At that point, did you make any attempt to get something from the clerk to corroborate what you're saying about the notice? I just spoke with... Is there anything in the record that we can look at? There's nothing in the record. No, and I did not get anything in writing from them. I called them. I spoke with their tech person who forwarded me to another person who was in charge of the department. Yeah, so it's basically kind of like if you have a phone app and the notices are turned off. Somehow the notice was turned off. I can't imagine why I would have done it. I don't know why it was turned off at all. There's no backup notification if you make an important change on the account. So you think whoever designed the system, software engineer might have built that in because of the importance of getting the notices. That's all I have on that matter. That's what happened. Okay, so under these three areas that we're going to focus on, on adequate notice, reviewed all of the court citations to the family medical leave cases. There is, and I've reviewed defendant's cases. There's absolutely nothing in the record that indicates that adequate notice is due when the leave that needs to be taken is unforeseeable. In this matter, the facts are clear, according to defendant. Defendant's statement of facts. I'm sorry, I don't understand what you're saying. You're saying the leave here was unforeseeable? Yes. Can you explain that to us? Why was leave unforeseeable? Yes. Thanks, Your Honor. So Kelly suffers from infertility disability. The record shows that November of 2016, she began treatments again. It also indicates that she's been suffering from this for many years and had tried before to get pregnant. So during the process, it wasn't until June 5th of 2017 that medically it was possible for her to undergo an embryo transfer. Isn't that a distinction, though, between foreseeability and scheduling it? I mean, don't we also know that starting in January of 2017, she was going through the process of preparing to do the embryo transfer, and there was a plan actually to have a transfer, I want to say in April, in April or so, and there was a snowstorm that stopped this. Okay, I see you're shaking your head. I'm sorry, I apologize. Please, please finish. No, no, I'll let you respond and I'm going to look for the deposition site that says this. I shouldn't have responded while you were speaking. I apologize. It's all right. Go ahead. No, no. In fact, I think the lower court's argument and defendant's argument is that case law is that if you know a procedure is coming up in the future in the case of the embryo transfer, maybe you don't know if it's going to be in a week or a month or in two months, then at some point you have to give your supervisor here, your employer, notice that at some point, I don't know what's going to happen, I'm going to have this embryo transfer. Okay, I'm in this. It's going to happen. I don't find anything in our, in third circuit or any of our circuits that supports those conclusions. There is no case in the record that was cited that actually has taken that position. That merely because she's attempting, she's involved in an infertility treatment that she has to give the court, I'm sorry, the employer notice that at some day in the future, in fact, she might have to take time off. What about 29 USC 2612 A1D and E2B? In any case in which the necessity for leave because of a serious medical condition is foreseeable based on planned medical treatment, the employee shall provide the employer with not less than 30 days notice before the date of leave is to begin of the employee's intention to take leave except if the date of that, of the treatment requires leave to begin less than 30 days. The employee shall provide such notice as is practical. Yes. Yes, Your Honor. Thanks. Yeah, that's exactly the right fit for this case as the record shows on June 5th of 2017. Kelly texted her first-line supervisor, defendant Penberth that she had learned that day that she would be able to move forward with scheduling the embryo transfer. Even on that day, there was some uncertainty about whether it would take place on June 10th. So although what you cited is correct, I believe this issue clearly falls in the unforeseeable leave category such that the notice requirement is, you know, essentially as soon as you become aware of it. I also point to the Wage and Divisions Guidance. I'm sorry, Your Honor. I'm trying to understand exactly what you mean, become aware of what? Are you saying that she didn't know that she was going to have the embryo transfer? We have deposition transcripts that go the other way on that. So what exactly are you saying that she was not aware of until June 5th? I'm sorry, Your Honor. I didn't understand in the depositions. So ignore the depositions. You said she was not aware of something until June 5th. Exactly. What was she not aware of until June 5th? Two things. Number one is that medically her body would be able, I don't know the medical terms, but able to, ready to submit to an attempt to transfer an embryo. Again, this is something that started in November and there's nothing scheduled. No embryo transferred before the June 10th embryo took place and according to the record, there's no time Kelly knew prior to June 5th of 2017 that this would in fact happen. So sure, it's short notice, but it was not foreseeable and this is why I was pointing out there's no case law in  higher standard or bigger requirement for employees where at some point in the future, they might have to undergo, in this case, like a surgery. I think the laws and the wage and division, FML wage and division guidance, for instance, states that we generally should be, you know, this should be very generally conserved. I think the more important thing of notice is letting the employer know pretty much as soon as you do now that you need it. I want to ask you something. So the text message that went across said that there would need to be bed rest for 48 hours after the embryo transfer with minimal movements for the next 48 hours and then late duty for the next week and a half. Do you know, is there anything in the record to indicate that she requested late duty or was it that she actually requested the full two weeks off? Thanks, Your Honor. The broader record indicates that she requested and she talks about wanting a lower heart rate. So she was looking for a less stressful environment, not a stress-free environment. So then I think the lower court cites that she requested the two weeks notice. So there's a difference. I think Defendant Penberth indicated she wanted a stress-free environment and that's quoted often. And her position was that she requested the two weeks leave and that is an alternative accommodation, a less stressful environment for purposes of trying to keep very calm while this embryo transfer was taking hold. I want to go back to the deposition. This is at J332. It starts at line 93, 3 through 8 and then page 111, lines 1 through 9. So there's testimony about starting a course of treatment in November 2016. Like you said, the treatments intensify in January 2017 and then there's a month that skipped because of a snowstorm and then treatments resume in May 2017. I'm struggling to understand why that timeline doesn't establish that she reasonably foresaw the need to take leave before June 5th, 2017. Thanks, Your Honor. I think it actually makes the point that we're trying to make on behalf of Kelly and that is what happened during that period that you're referring to, her body failed to be responsive enough chemically, whatever the blood work that needed to be done, whatever happened, it didn't come together. So she, my medical understanding is very limited, but something to do with the timing of her monthly menstrual cycle and everything else. I think there was something like a month where they had to do a reset and begin the process again. So it kind of gets to the point is there's great uncertainty about whether you can get to the point where you have a medical, you can have the embryo transfer. So are you telling us that she, that it doesn't become foreseeable until she absolutely knows that it's going, she's going to be able to have the transfer? So if a person thinks that I have a heart condition and I might need to have surgery, but I'm going to have to get some tests to determine whether or not I'm going to need to have surgery, what you're saying is that the law doesn't require you to make your employer aware until you're absolutely certain that you're going to have to have the procedure at issue? Even if you're planning to have the procedure at issue? I think under that analogy, I think you probably, the person probably have more control about whether they want to have a heart procedure, that's more of an elective procedure, and there'd be some certainty around whether that would go forward. Whereas in a cynical situation... So what if a person is waiting for a transplant? You know that you're on a wait list, you hope that your name gets called, right? You're going to accept, you know, most people do when their name gets called. Sure. Foreseeable, not foreseeable, should you let your employer know, or should you just sit there and say, you know what? Because a lot of those transplants, it's next day. Coming the next day. You know, I mean, it's very... Good example. It's, you know, it's good for the person receiving. It usually results in unfortunate, unsuspecting death the day before. Yes. But what do you do? Do you let your employer know when you get the call that you're going in at 5 a.m. the next morning? Or do you say, hey, I'm on the list? Where's foreseeability fall? Yeah. Thanks, Ron. That's a great analogy. So even using the facts most favorable, right? I think that even under that, I think under our case law in the Third Circuit and all the other circuits, it's still an unforeseeable event because they don't know when it's going to happen. But your answer to them is that you don't have to make the employer aware until you get the call? Until you know when that's going to happen. So when you get the call. When you get the call that day. Yeah, I agree. So let's just make it a little harder. You're on the transplant list. Harder than that? But you're on the transplant list and every now and then they'll tell you where you are on the list. You know, every now and then they'll say, hey, there's 17 people in front of you. Let's say you call and you find out that you're next on the list. You need to call then? Or do you have to wait till the day of? Sure, two points on that. The first, Your Honor, is that in Lichtenstein, for instance, there's a situation where the employee's mother went to the emergency room. She goes to the emergency room, calls right away that the mother was sick. That was considered adequate notice under the circumstances. So I think we do approve leave under those types of circumstances. By analogy on this one, let's reverse it and go in the other direction. If Sinico had told her employer on November 1st of 2016 where the facts indicate the treatment started again, what good would that have done the employer? There's zero because she couldn't tell them with any kind of certainty what happened here. And this concept where the employer is giving up the authority over someone's time, a person's leave time, was a fundamental change in our laws in 1993. Prior to that, employers controlled family time. This law is to protect the employee and give them an elevated surface and an elevating playing field to correct situations. Even like this, we're on very short notice. I think it's less than a week. She becomes aware of it. Facts indisputable that June 5th, she becomes aware of it and notifies. You're over time, but if you'll excuse me, I've got one more hypothetical, and this is somewhat related. But assume that a person wants to take leave for birth of a child, right? You don't know, you get a due date, but no one knows if that holds. You know, babies come early, babies sometimes come late. Do you just have to wait until you're on your way to the hospital because you don't actually know when the baby's going to be born? Or is it foreseeable that you should give notice at some earlier point in time? I think we don't know exactly what that time is. You know, there's usually the distinction, Your Honor, is that usually I believe when someone gives birth, they have an estimated due date and that doctor's office gives it to that employee. In those kind of circumstances, sure, I think it would be appropriate to notify the employer that I'm expecting to give birth, you know, whatever it was on June 10th. Here, there was no date given. The earliest she knew, June 5th. Let me ask you a couple questions about... I'm over my time, so I apologize. That's all right. Okay. If my colleagues are okay with it, I have a couple more questions I want to ask you. I want to ask you about the failure to accommodate claims under the RA and the ADM. As I understand the crux of your argument on that, it's that the employer didn't make a good faith effort to participate in the iterative process. Is that correct? In what process? In the iterative, the back and forth process and under the failure to accommodate. So this was once you walked in and answered two weeks, the paint fumes issue and... There was a third one. Yeah. Am I correct about that? That's not the crux of the argument. The crux of the argument is really twofold. That's where Lichtenstein comes in, where you have this triggering event. All of these behavioral performance issues were documented on March 26th of 2017. They sit on it for 12 days. She makes the accommodation request and then the next day they call her into the office. Under Lichtenstein, that immediately raises an inference that you have causation, that a reasonable prior fact could conclude that, but for the request, they wouldn't have  Maybe they would have done something else. I wasn't talking about the retaliation. I wasn't talking about the retaliation claims. I'm talking about... Just on the ADA accommodation. The accommodation claims. So I think we could make the argument that they didn't sufficiently interact. There was no follow-up. I think the... But probably the more important argument is that the request for two weeks leave was a reasonable accommodation. If we go further, I mean, should have been granted. Secondly, if he had engaged in an interactive process and sought information, I think there are a multitude of accommodations available, remote work. Different things basically just to keep her heart rate down. I just have one last question for you. Is there anything different? Anything else? If we were to address on the merits, the RA and the ADA claims, the arguments are the same under both of them, right? There's not something different under the ADA that you're arguing? I think just under the RA, mostly we're held to a higher standard of intent. Okay. And then it's disputable whether we can make that out. Okay. All right. Thank you. Thank you very much, Your Honors. All right. We'll hear from one of the counsel for appellees first. I think it's going to be from the Commonwealth. Is that right? That's correct, Your Honor. You have 10 minutes. Yes. Thank you, Your Honor. Robert Crandall on behalf of the Commonwealth of Pennsylvania and Judge Tilwock in his individual capacity. Your Honor, I first want to start in here with the leave issue about whether it's foreseeable or unforeseeable. Pointing to that, it seems to me that almost all of this case turns, from your perspective, turns on the district court's finding that there was no notice. Why isn't that an issue of fact? I could not find another case where the issue of notice and whether or not the notice that was given was reasonable was decided as a matter of law. In the case you cited, Bailey, I think it was out of Eighth Circuit, was after a trial and there there were 72 absences. Here you got a woman who was an employee for 17 years with this agency. And all of a sudden, she lets folks know that she might need to have some leave. I know that's disputed because of the fertilization process. And almost immediately, you know, the district court says there's no proximal relationship here. But basically the next day, the next two days, she's on her way out the door. But for the vacation, which delayed it a few weeks, she gives notice on June 5. At least that's a disputed issue of fact. Within days, her whole status of that agency changed. Went from being an employee of 17 years, who in 2017 had had exemplary evaluations, to somebody who's out the door because of all these record-keeping errors. Why isn't all that an issue of fact? I know that I'm being afraid you're going to start out asking about notice and now I'm throwing all this other stuff at you. But why doesn't that all come down to notice and whether or not she gave notice? Because it can be as a matter of law in this instance, based on the lack of facts. That's our position here. So she's saying she texted on June 5. Sure. Are you saying matter of law as to whether it was reasonable or whether it was given? In essence, our position would be both. Because on text message, what you see happens, Dwight Penrith texted her after hours, 7.50 something at night, and he asks her, can you come to my wedding? And she says, I don't know if I can, and then she gives the reasons why. And in that, she buries in there this idea that she's going to possibly have procedure, which is very uncertain even in the text message. She's not really committed to anything in that text message. And then the next day, she comes into his office and she says to him, well, can I have these two days off? That's June 6. That's June 6, the next day. Yeah. And as a matter of law, there are a couple of things that are at play here, is that number one, whether that constitutes sufficient notice into the FMLA, our original argument was no. That's very, very vague on these facts, number one. But what's vague about it? She mentions the fact of the procedure that she might have to have. Correct. And that she might have to be out for a while. And in the regs, as I understand, in the regs say that notice must be given, quoting, as soon as practical means as soon as both possible and practical. A jury could look at that and say, given the nature of the process that she was looking at, this is practical. This is, because had she given the notice back in November, as I think either Judge Phipps or Mr. Muir said in response, the employee is not going to really do anything about that. They know at some point in the future, this employee is going to be absent. But they don't know when. They're not going to, I don't think, start juggling things around. But all of that, it seems to me, comes down to a pure jury question. The jury might totally agree with you, or the jury might say, given the nature of this proceeding, that was the earliest notice that she could give that was practical. But we don't have, there's no fact of record that supports that, Your Honor. Here's what happened, is that she discloses the IVF procedure. Now, that's the first time that gets disclosed. And that's only a couple days away on the 10th. Now, that gets to the adequate notice. On the 10th of what month? June. June. Only a couple days later. So in that year, Tuesday fell on, was the 6th. And she disclosed, on Saturday, I'm going to have this procedure on the 10th. And Dwight Pemberth has no authority. We produced, you know, undisputed facts on that point. He has no authority to do that. And rightfully so, under the FMLA and the ADA. As a supervisor, he's... He kicked her off to a, I mean, the majority of it. He basically said, go tell the supervisor. No, but the problem is, is that the ADA and the FMLA has confidentiality provisions that shield, that prevent front-line supervisors from getting access to these underlying health conditions. The ADA, cited in the FMLA, 29 CFR 825.500, specifically cordons off a supervisor like him from even really being involved in the process. Then how is she going to notice? She could follow the procedure. She has her collective bargaining agreement that tells her, go to the office. She knows to go to the office. We know that from the record. She knows how the HR works. The other thing she has is, she has the FMLA notice poster up and she has the handbook. She has three minutes. But when you say go to the office, there's this kind of a word in there. You can't just go to the office and say, what do you mean by  There's someone there that she's got to... Right. There's, there's a, there's, the reason for this is that the FMLA has forms. It has medical certifications that are needed. She has to disclose her health condition, have a medical provider certify certain things. And that's all handled by somebody that's not Dwight Penberth, because under the FMLA, he's not supposed to be handling that. So he didn't kick her out. He sent her to the place that can help her. He, you know, didn't deny anything in essence, Your Honor. He didn't, he didn't have the power to grant or deny it. He, it's, it's just not his function. Rightfully so. That is her media supervisor though. He's her field supervisor for case notes and for, yeah, for those cases. But again, to me, you may well be making an argument that Adria would agree with, but it seems to me that, and I think your case law is consistent with this, it's a question that a jury should resolve. And the number of issues like that, that we can go down the list where whether or not, if that is taken as reasonable notice, reasonable, as soon as practical, then the whole proximate nexus is totally different. The district court thought there's no proximate relationship here, such as when you rise to the inference of causation. To me, the, the, the emphasis is very strong because you go from, again, a 17 year employee, all of a sudden things change for her as of June 5 or 6, when it's known to the company that she might have to be out for this fertility treatment within literally within days, but for the vacation that some folks took. She's out. And then the thing that I don't understand, that letter that was backdated to May 27, which would make it look that it was before the June 6 conversation. I don't understand why it was backdated. That's something a jury could look at and say, well, they're trying to hide from the, from the discriminatory motive. It's undisputed fact, undisputed record that it was not backdated. The process began in May. They began a case review in May and the memo was completed by May 26. And there's, there's no, there's no fact at all in the record that says that anybody backdated that. And that's, and that's how that happens. The June, the June 7th meeting, the, the process where they met with her to talk about the case net review, because it started in May and that's undisputed on these, on this, on these facts. That was going to happen, you know, regardless. That's because of the so-called shoddy, shoddy record-keeping. I'm sorry, say that again. You're talking about the shoddy record-keeping? Yeah, the record, the record-keeping issue. But then again, a jury could look at Penberth, who also had, I think it's admitted, had problems with his records. He was promoted. Now, I think your argument is, well, those were different records in kind, but a jury might think that, well, there may be different in kind, but we've got two employees who have problems with their record-keeping. One is showing the door and they use record-keeping as an excuse for that. And the other one is promoted. That, and I'm not suggesting that any of this happened. I'm not casting aspersions on your clients. I'm simply saying there's so much here. It seems to me that would be traditionally viewed as being an issue of fact as opposed to an issue of law. And you've got the plain error situation. That's another hurdle. Take it over and we can talk about that. But I think there is some plain error in terms of the test that you use for discrimination, whether it's a sole cause, whether it is a motivating factor, and that we can talk about. And I think, but I think if the court's wrong about that, that is plain error, saying that it was the sole cause. Yeah, and just the problem, though, that you keep having. I know Your Honor keeps saying that, you know, these are issues for the jury to determine. The problem is, is just the record here just doesn't, it doesn't have enough disputed facts. I understand Your Honor's drawing an inference from some of these facts and, you know, I, you know, I obviously are going to disagree. I'm trying to say the jury can draw the same inference. I'm not, and I apologize if it's looking like I'm drawing an inference, because again, I don't want to cast aspersions on any of your clients or on your colleagues' clients. But looking at this through the lens we have to look at it in terms of whether or not this is something which is so crystal clear that could be decided as a matter of law. It troubles me that a jury didn't get a chance to weigh these things. A jury might come out exactly where you are. They may also come out agreeing with Mr. Muir looking at this lady's history with this agency. Yeah, you know, Your Honor, and the problem, though, with a lot of that, though, still comes back to the fact that, you know, based on the, are those inferences reasonable as a matter of law here? Obviously, you know, obviously we, you know, we see it differently on that. But the, you know, the critical issue that keeps coming up on the appeal, and I heard, you know, discussed earlier, this IVF procedure, that was something. Is the word, I'm sorry. This IVF. Right. Intravitreal Fertilization Procedure, embryo transfer, sometimes referred to as. That's a specific procedure. It's an end goal, and that was not disclosed until June 6th. And as a matter of law, there is adequate notice requirements in the FMLA. And I notice as I'm answering this. Notice becomes practical. What's practical for one procedure may be very different from what's practical in the IVF. And his allegation is that this is so dependent on her blood work came out that she really didn't have any clue really, as to be specific enough to tell her employer until January 5 or January 6. Right. Can I answer that question? You're out of my mouth. Come on. The problem is, is that while the actual date of when it would happen may have been a moving target, she knew that she was going to have an IVF procedure. And that's the part that she never disclosed until. Yeah, I understand that. That, my concern is whether or not that's practical or not and the company could be asked, had you known earlier, what would you have done? Those kinds of things could be worked out in court. Had she had the opportunity to do it? Well, thank you, Your Honor, for hearing me on these issues. I appreciate that. Appreciate the time here today. Thank you very much. We'll hear from counsel for the co-appellants. I understand you, you've divided the time. So you have five minutes. Thank you, Your Honors. Christopher Scott representing Penberth prisoner and Barry on their individual capacities only. So only related to the FMLA. To go directly to the questions of Judge McKee about whether a jury could see this separately. Appellant has always requested a bench trial. So this is something that is specifically looked at by Judge Wilson. Let me use the term jury generically then. Okay. Fact-finding. Fact-finding. Fact-finding. Thank you. Correct. But I think it's important to make that distinction in this case that no one. That's what it is. The judge, jury, it's the fact-finder. Right. But Judge, Magistrate Judge Stapparito made the recommendation and Judge Wilson adopted the same. So she took a look at this, but there is a lack of evidence going to that point. Specifically, there is a distinct lack of evidence going to the comparator analysis. I think Your Honor brought up about Mr. Penberth, my client, about whether he was appropriately disciplined enough and not showing the door, as Your Honor indicated. Well, none of that was my suggestion. My suggestion was a fact-finder, i.e., the judge now, could look at the fact that Mr. Penberth had problems with his records and look at the fact that one of the reasons given for, I guess, the reason given for Ms. Sinico's dismissal termination was the problem with her records and conclude that, well, what's really going on here is pretext under McDonnell Douglas and that she was shown the door because of the assertion of ADA leave and family medical leave and they covered themselves by saying she had problems with her records, which she did, but the fact that there's somebody else there who had problems with her records and he wasn't fired, we're going to reject that explanation. We're going to conclude it's pretext and conclude that the real motive is more likely than not in the improper discrimination. That was where I was wrong with that. I think that might be a bit of a red herring kind of argument because I think if you go through any company or corporation, you might see someone within the company who may be a peer or an equal of a person who's terminated have a problem and not disciplined for it. This case, we have a plaintiff who was woefully inadequate in terms of her record-keeping versus someone as the plaintiff was able to flesh out basic facts that there were some lack of record-keeping there. It's just we don't have records of and facts of evidence to support whether this is an equal exchange of he did the same thing as her and he was kept on and she was shown the door. So I think that's a bit of a red herring because we see people in the employment community all the time have disciplinary records, but one is let go. She was let go for legitimate business reasons as it relates to woefully inadequate record-keeping. As for notice, I know that Your Honors have discussed notice ad nauseum here with both counsels and I don't want to necessarily reflesh out that part, but we're talking about notice as it relates to a condition where she was clearly planning this beforehand. There's record evidence that shows that she was planning that this was going to lead up to this fertility treatment. She had intermittent days of going off one or two days at a time doing treatments before that going back to November of 2016. You know, Judge McKee kind of asked about this as soon as practical. And so, you know, if she doesn't have a date or doesn't even have a timeline necessarily for when this is going to happen, we get this kind of, you know, this strange practicality sort of thing. And so if she doesn't know a real date, you know, I used the transplant, you know, analogy earlier with the notion of, hey, maybe if you just put yourself on the transplant list and you're way, way, way down the list, maybe you don't have to give notice because it's too uncertain if you'll ever get it. It's too uncertain, you know, when you'll get it, you know, maybe that doesn't work. But as things become more and more certain, maybe as you go up the list and you're in the top three or you may be next, maybe then you should give it. And so kind of the question here is, you know, if we want to talk practicality, can you kind of, you know, give a ballpark date for when that would be practical? Well, June 6th, say it's too late, you know, it may be that November 1, 2016 is too early, right? But if this isn't a question for a jury, a fact finder. Peer influence is powerful. But if this isn't a question for a fact finder, right, and it's a question of law, then are we supposed to pick the date and just say, hey, on these facts, March 1st would have been as soon as practical? Or should we just leave that for a fact finder? And so I guess the thought is, if it is a question of law, then are you able to identify the date on which it was legally practical? Or if not, then isn't it really just a question of fact that maybe a fact finder should address? I'm out of time. So, no, no, I took most of that. So you get it back. In terms of the question factor law, I agree with you that there is no bright line test for what that actually means. In the way that the courts around the country have reviewed that in terms of whether there's something scheduled versus something emergent, I think the heart condition, in my view, I would argue that the knowing of the heart condition and of making an employer aware that this might be coming would be probably reasonable in that situation without being able to disclose a date ahead of time. I believe in this situation, had she been able to inform her employer that this two weeks off that she requested or light duty, depending on which way we're going with it, was coming up, she could have informed that well in advance rather than via text message four days before and then medical expert to know exactly that this is a different type of condition that she asked for off before. So if I hear what you're saying, you're saying it's still a question of law. I can't give you an exact date as a matter of law, but I can just say that this date was too late. Well, I can't give you a date because I don't think any courts have given us a date as to when it in fact is reasonable. Which begins to suggest that maybe it's a question of fact. But I think that it does go towards the question of law and I'll leave it at that. I think it does hem both ways. Thank you, Your Honor. All right. Mr. Mayor, I think we have, I had you down as two minutes on rebuttal. Is that right? Yes, Your Honor. Defendants just stated that it is fact of record that that on May 26th of 2017, the the employer completed the case management review. We agree. It actually supports our claim under Lichtenstein. Employer knew ahead of time what the behaviors were that were of concern to them. They did nothing with it on the 27th of May, 28th of May, all the way up until June 7th, 12 days. That's just within this very narrow reading of the facts that are, that are in the lower court's report and recommendation. If we go to the broader case, there's testimony from Kristner, the second level supervisor, that those are the facts that were relied upon when the termination decision was made. Again, after the leave request. And that's why we believe, you know, a fact finder could draw an inference. That, but for Sinico's leave request, she would still be an employee there. She might be written up. There might be some discipline. She wouldn't have been terminated. And that is, and her request was the a negative factor or under the mixed motive theory, a motivating factor. Also address the idea of whether it was known whether she had, she was in the in vitro fertilization program. We're talking about a small office in a small rural county, one floor, no dispute about, about any of that. Pardon? Where is this county? Lebanon County. But where is Lebanon County? Oh, sorry. It's a little bit west of Harrisburg, maybe roughly 30 minutes. Okay. Probably an hour and a half outside of Philadelphia from here. Traffic's good. Maybe a little bit longer. But at any rate, there's discussion among the small group issues in this process. And just to clarify, oh, I'm sorry. I'm out of time. To the red light. Very great. Very tedious of you, but you can finish the thought. Okay. Before the break. Why did you pull a request before? Cut yourself off in the middle of a sentence. On the text message, a couple things. It was common practice. It was permissible that Kelly communicate with her supervisors about these leave requests, about the intermittent requests, often after hours. Maybe they were talking about the wedding, Mr. Penberth's wedding, but they were also talking about her leave, and it's very clear in there. Read that carefully. I'm finding out, basically paraphrasing for the first time that the MBO transfer is going to go forward. Even at that point, she's still not certain, but she puts them on notice. So thank you very much for your time. Unless there's any further questions.